UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

v.

RICHARD LUCAS,

                  Defendant.
_____

**REPORT AND RECOMMENDATION**

17-CR-129-EAW-JJM

      Defendant Richard Lucas is charged with conspiring to possess cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Indictment [18].[1] Before the court is his motion to suppress evidence and statements resulting from his July 20, 2015 encounter with law enforcement at the San Diego International Airport [50]. All other pending issues raised in defendant's pretrial motions are pending before District Judge Elizabeth A. Wolford [74]. A hearing with respect to the July 20, 2015 encounter was held on May 7, 2018 [83]. For the following reasons, I recommend that defendant's suppression be denied.

## BACKGROUND

      At the May 7, 2018 hearing, San Diego County Deputy Sheriff Eric Mitchell testified that he was part of a Drug Enforcement Agency ("DEA") drug interdiction task force working in San Diego. [83], p. 4. He stated that San Diego is a known source of drugs because of its proximity to Mexico. Id., p. 6. He also testified that drug traffickers often make last minute

---

[1] Bracketed references are to the CM/ECF docket entries. Unless otherwise indicated, page references are to numbers reflected on the documents themselves rather than to the CM/ECF pagination.

travel plans, and that airline sources will notify the task force of anyone who makes travel arrangements within 72 hours of the flight. Id., pp. 8, 26-28. Analysts working with the task force research those names to see if these travelers have a criminal history involving arrests for drug trafficking or any other information that might raise a suspicion of illegal activity. Id., pp. 26-29, 33. Deputy Mitchell stated that because defendant made his flight arrangements within 24 hours of the flight and had a criminal history of narcotics-related offenses, the task force decided to make "consensual contact[] to see exactly what is going on". Id., pp. 9, 29.

      Deputy Mitchell, his partner Deputy Alberto Santana, and DEA Special Agent Tracy Burr[2] waited at the San Diego International Airport and trailed defendant to the baggage claim area after he deplaned. Id., p. 9. Deputy Mitchell acknowledged that defendant looked like "a regular person" getting off the plane, and that he walked normally and was not doing anything which would be considered "furtive" or "suspicious". Id., pp. 36-37. After defendant was observed obtaining his bags from the baggage carousel, Deputies Mitchell and Santana approached and asked defendant if he was Richard Lucas. Id., p.10. At the same time, Deputy Mitchell showed defendant his credentials and identified himself as a police officer. Id. According to Deputy Mitchell, defendant initially denied being Richard Lucas, but after he was asked to produce identification, defendant produced a North Carolina identification card and acknowledged that he was Richard Lucas. Id., pp. 11-12. Deputy Mitchell described the next part of the encounter as follows:

> "We asked him what his purpose of traveling to San Diego was, upon which time he told us just visiting a friend. I asked him, you know, I know that you kind of purchased it last minute, what was that about? Oh, it was a last-minute trip. Okay. No problem. I then asked are you traveling into San Diego with any contraband, weapons, narcotics, anything of that nature, to which he replied he was not. After that I said, okay. Great. Do you mind if my partner searches your bag, upon which time he voluntarily handed Alberto Santana - Deputy Santana his bag."

---

[2] See Government Exhibit 1, p. 2.

Id., p. 12.

Deputy Mitchell stated that defendant appeared to be nervous and was visibly shaking, but that he did not hesitate to answer any questions and he was very forthcoming. Id., pp. 13, 21. He testified that defendant handed his bag "straight over", and that he verbally consented to the search. Id., p. 13. As Deputy Santana searched defendant's bag, Deputy Mitchell asked defendant if he was traveling with any currency. Id. According to Deputy Mitchell, defendant stated that he had $5,000 and produced it from his pants pocket. Id. As this exchange was happening, Deputy Santana had located various additional amounts of currency among the clothing in defendant's bag. Id., pp. 13-14. Upon finding the additional currency, Deputy Mitchell testified that he advised defendant as follows:

> "After the money was located within the terminal, again, we stated hey, man, you're not under arrest or any trouble,[3] but we'd like to speak to you further about the currency in your possession. The Harbor Police has a small office nearby, we'd like you to follow us there and we can speak about the money."

Id., p. 16. Deputy Mitchell's report reflects that defendant was advised that he was "free to leave at any time". Government Exhibit 1, p. 4.

Before leaving the terminal, defendant was given back his luggage, including the currency, which he carried with him as they proceeded to the police office. Id. He was not handcuffed or frisked. Id., pp. 16, 61. According to Deputy Mitchell, he simply asked defendant if he would accompany them to an office which was about 100 to 150 yards away, and he did so. Id., p. 17. The office was described as a "20-by-20 room that has a dividing wall and a door, but it's all one room", with a table and chairs. Id., p. 58. The door to the office has a manual key

---

[3] Defendant does not argue that he went with the deputies because he had been misled by the statement that he was "not in trouble".

coded lock. Id., p. 60. Deputy Mitchell testified that he sat at the table on the opposite side from where the defendant sat at the table, while Deputy Santana searched defendant's bag more thoroughly. Id., pp. 62-63.

Once at the office, defendant was again assured that he was not in trouble or under arrest.[4] Id., p. 17. It was determined that defendant had a total of $36,100 in currency. Id., pp.15,17. Deputy Mitchell asked defendant why he had so much money, to which defendant responded: "I'm out here to by as much high-grade marijuana as I can". Id., p. 17. Defendant also purportedly admitted that he had made a prior trip to San Diego to purchase $14,000 of marijuana. Id., pp. 17-18.

Deputy Mitchell testified that defendant had three cell phones in his possession during the encounter. Id., p. 21. In Deputy Mitchell's presence, Deputy Santana asked defendant for consent to search the cell phones. Id., p. 23. He stated that he does not recall the exact words used because Deputy Santana had the exchange with defendant. Id., pp. 23, 70-71. However, Deputy Mitchell testified that he believes defendant said something to the effect: "yeah, go ahead" and that defendant did not say "no" or "don't search my phone". Id., p. 83. Deputy Santana searched the phones, and took photographs of the phones and screen shots of content on those phones. Government Exhibits 3A-3M. The phones were then returned to defendant. [83], p. 24.

---

[4] The transcript of Deputy Mitchell's testimony states that he "[a]gain, assured him he's in trouble, not under arrest". Id. This reflects an error in the hearing transcription. A review of the audio recording of the hearing reflects that Deputy Mitchell stated that he "[a]gain, assured [defendant] he's *not* in trouble". This makes sense in the context of the sentence, inasmuch as the use of the word "again" would suggest that Deputy Mitchell repeated his prior statement that defendant was *not* in trouble. Id., p. 16. Also, Deputy Mitchell's report reflects that upon arriving at the office, defendant was again assured that "he was not under arrest or in any trouble". Government Exhibit 1, p. 6.

At some point, a narcotics detection dog was brought in to the office and made a positive alert for the odor of narcotics on the currency. Id., pp. 19, 72-73. Deputy Mitchell testified that at no time during the encounter did defendant ask to stop the discussion. Id., p. 20. At no time was any force used or any weapons displayed. Id. Defendant was asked to put the money on the table, to be placed into an evidence envelope which was signed by defendant, Deputy Mitchell and another agent. Id., p. 18-19. Deputy Mitchell stated:

> We explained to [defendant] that we would be seizing the money, that it wasn't the end. If he wished to go after it and there was legitimacy to the money, that there was an option for that as well. We gave him a receipt and had him sign. . . . I took $500 from the seized currency, gave it to [defendant], packed up all his belongings, gave him a receipt, and escorted him out of the terminal – or out of the Harbor police office pack into the main terminal."

Id., p. 76. Defendant walked out into the terminal and Deputy Mitchell had no further contact with him. Id., p. 77.

Defendant did not testify at the hearing, but did submit a declaration in which he stated that after he obtained his bags from the carousel at the San Diego airport, he was approached by two men who did not look like police officers[5] and did not immediately identify themselves as such. [50-2], ¶4. He acknowledged that, when asked, he initially denied being Richard Lucas because he did not know who these men were. Id.

According to defendant, the men then showed him a mugshot of himself, identified themselves as police officers, and told him that his name came up on a terrorist watch list. Id.[6] Defendant stated that as he gave his identification card to one officer, the other grabbed

---

[5] Deputy Mitchell testified that both he and Deputy Santana were wearing jeans and t-shirts [83], pp. 41-42. Deputy Mitchell was also wearing a ball cap. Id., p. 42. He also testified that he is six feet tall and weighs 250 pounds, while Deputy Santana is five feet six inches tall and weighs approximately 170 pounds. Id. All three officers were carrying concealed weapons

[6] Deputy Mitchell denied that plaintiff was told he was on a terrorist watch list [83], p. 44.

- 5 -

his luggage and started to unzip the bag. Id., ¶5. Defendant contends that he agreed to allow them to look in his bag because the officer had already opened the bag and he felt "cornered" by the police. Id. He asserts that one of the officers stated: "[w]e need to talk with you. Come back with us", and that the other officer "placed his hand on my shoulder and grabbed my shirt". Id., ¶6. He states that he went to the office with the officers because he "did not feel free to leave". Id. Defendant states that the officers searched his luggage, asked him questions, and took possession of his phones and money. Id., ¶7. Although he states that he does not recall being presented with a consent form for the search of his phones, he does not state that he verbally denied the officer's request to search the phones. Id., ¶8.

      In moving to suppress the physical evidence and statements obtained during the July 20, 2015 encounter, defendant argues that the officers did not have reasonable suspicion to conduct a stop under Terry v. Ohio, 392 U.S. 1 (1968), and that he was subjected to a warrantless search without probable cause. Defendant's Memorandum of Law [50-1], pp. 3, 4.

## DISCUSSION

**A.    The Initial Contact**

      There are three levels of encounters between police and citizens: (1) the consensual encounter, which may be initiated without any objective level of suspicion, (United States v. Mendenhall, 446 U.S. 544 (1980)); (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity, (Florida v. Royer, 460 U.S. 491 (1983)); and (3) the arrest, valid only if supported by probable cause. Illinois v. Gates, 462 U.S. 213 (1983).

      Defendant argues that he was "seized" for purposes of the Fourth Amendment from the beginning of the encounter with the deputies in the terminal. Defendant's Post Hearing

Brief [103], p. 3. The government asserts that the entire encounter was consensual and that the defendant was free to end the encounter at any time. Government's Reply [105], p. 3. The record reflects that defendant was approached by two plainclothes deputies who asked him for identification and why he was traveling to San Diego. No weapons were displayed, he was not surrounded, handcuffed or even frisked. [83], pp. 16, 61. Therefore, the initial contact between defendant and Deputies Mitchell and Santana in the terminal was a consensual encounter, similar to that described in United States v. Peterson, 100 F.3d 7, 10 (2d Cir.1996), during which "officers may permissibly ask questions, such as why the subject is at that location, and may make requests for identification and permission to inspect luggage". Id.

The fact that the deputies possessed some information about defendant prior to the encounter does not preclude them from consensually encountering him to make the inquires outlined in Peterson. Although defendant claims that the deputies told him that he was on the terrorist watch list (defendant's Declaration [50-2], ¶4), Deputy Mitchell denied that any such statement was made. [83], p. 44. I credit Deputy Mitchell's testimony as to how the encounter began and evolved. See United States v. Iverson, 2015 WL 13216848, *8 (W.D.N.Y. 2015), adopted, 166 F. Supp. 3d 350 (W.D.N.Y. 2016), aff'd, 897 F.3d 450 (2d Cir. 2018) ("[a]bsent [defendant's] live testimony and the opportunity for cross-examination, the Court cannot assess his credibility or truthfulness . . . . Therefore, I credit the testimony of the live witnesses over the contents of defendant's affidavit where a conflict exists").

Defendant further argues that he only gave his consent to allow the deputies to search his bags because he "felt cornered". Defendant's Declaration [50-2], ¶5. Again, defendant does not allege that the officers surrounded him, displayed their weapons or used any force or intimidation when they asked for consent to search his bags. He has articulated no basis for concluding that a reasonable person would have felt "cornered" or unable to refuse the

- 7 -

deputies' request to search the luggage. Again, I credit Deputy Mitchell's testimony that, when asked if they could search his bags, defendant handed them over to Deputy Santana voluntarily. Accordingly, I find that the initial encounter between defendant and the deputies in the terminal was consensual, that defendant's statements were voluntarily made, and that defendant consented to allow the search his luggage.

### B.     Continuation of the Encounter at the Office

It is undisputed that upon finding a significant amount of currency stashed in the clothes and shoes in defendant's luggage, the deputies asked defendant if he would accompany them to the nearby harbor police office at the airport. Deputy Mitchell testified that defendant agreed to go to the office without any additional discussion. [83], pp. 16-17. Defendant was in possession of all his luggage and belongings, including the currency, which he carried to the office. Id.  According to Deputy Mitchell, he led the way with defendant and Deputy Santana following. Id., p. 59.  He testified that Deputy Santana was walking to the side of defendant, approximately three to four feet away from defendant as they proceeded to the office. Id.

Defendant states that he followed them because they called him a terrorist and he did not feel free to leave. Defendant's Declaration [50-2], ¶6. He also claims that Deputy Santana "placed his hand on my shoulder and grabbed my shirt". Id. Again, since defendant did not testify at the hearing, I give this statement less weight than Deputy Mitchell's testimony that defendant voluntarily accompanied the deputies to the office. Although defendant chose to cooperate after the deputies identified themselves as police officers, he does not contend that at any time while in the terminal or the office that the deputies displayed weapons, surrounded him, or made any threats. According to Deputy Mitchell, Deputy Santana was three to four feet away

from defendant as they walked to the office ([83], p. 59), casting further doubt on defendant's claim that Deputy Santana had grabbed his shirt.

Defendant has not refuted Deputy Mitchell's testimony that even after the money was discovered in his luggage, defendant was told that he was "not under arrest or any trouble" ([id.], p. 16), and that he was free to leave at any time. Id., p. 65; Government Exhibit 1, p. 4. Nothing in the record suggests that defendant was locked in the office or that he would have been precluded from leaving had he attempted to do so. After the discussion, defendant left with his belongings, a receipt for the seized currency, and was advised that there was a process by which he could seek the return of the currency if he could demonstrate a legitimate source. [83], p. 76. Under such circumstances, I find that the continuation of the discussion in the office was consensual.

Even if I were to credit defendant's statement that he followed the deputies to the office because he did not feel free to leave, suppression would not be warranted. Under such circumstances, the consensual encounter would become a Terry stop. *See* United States v. Compton, 830 F.3d 55, 65 (2d Cir. 2016) ("[a] consensual encounter becomes a Terry stop when under the circumstances, a reasonable person would have believed that he was not free to leave."). "Terry stops do not require probable cause, but, rather, reasonable suspicion that criminal activity has occurred or is about to occur." United States v. Levy, 2016 WL 6835539, *8 (E.D.N.Y. 2016). To satisfy Terry, police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion [on a citizen's liberty interest]". United States v. Elmore, 482 F.3d 172, 178-79 (2d Cir. 2007).

Here, even if I were to assume that the encounter ceased to be consensual when defendant was asked to continue the discussion at the office, the record reflects that the deputies

- 9 -

had sufficient reasonable suspicion to justify further investigation under Terry. Defendant, an individual with prior drug trafficking arrests made last minute arrangements to fly to San Diego, a known drug source city. A consensual search of this individual's luggage revealed that he had over $36,000 with him, most of which was stashed in the clothing and shoes in his bags. Considering the totality of the circumstances, the deputies could reasonably suspect that criminal activity was involved and that further investigation was warranted. This is particularly so in light of Deputy Mitchell's experience regarding San Diego as a drug source city, that drug traffickers often make last minute travel plans, and the fact that it is unusual to travel with that much cash stashed in a suitcase among clothes and shoes. [83], p. 49. *See* United States v. Hibbitt, 208 F. Supp. 2d 1026, 1034 (D. Alaska 2000) ("a chain of otherwise innocent-seeming or innocuous circumstances may -in the aggregate - take on new meaning suggestive of suspicious activity or a chain of innocuous circumstances may be perceived in a different light by a trained and experienced law enforcement agent").

    Again, assuming *arguendo* that the continued discussion at the office constituted a Terry stop, the fact that defendant was not provided with his rights under Miranda v. Arizona, 384 U.S. 436 (1966) does not require suppression of his statements or the evidence. In Berkemer v. McCarty, 468 U.S. 420, 440 (1984) the Supreme Court noted that it has not held that Terry stops are subject to the dictates of Miranda. However, Berkemer did not erect a *pre se* rule that Miranda warnings were never required during a Terry stop. United States v. Newton, 181 F.Supp.2d 157, 170 (E.D.N.Y.2002) ("Supreme Court did not adopt a bright-line rule that Miranda warnings are never required during Terry stops").

    In Newton, the Second Circuit suggested two factors relevant to determining whether a lawful investigatory stop involves restraints sufficient to trigger Miranda rights are: (1) "whether a reasonable person in the suspect's shoes would have understood that his detention

- 10 -

was not likely to be 'temporary and brief"; and (2) "whether a person stopped under the circumstances at issue would feel that he was completely at the mercy of the police". Newton, 369 F.3d at 675 (internal quotations omitted).

In this case, defendant does not contend, and the record does not reflect, that he was detained for a prolonged period of time. The discussion both in the terminal and at the office, as described by Deputy Mitchell, reflects a relatively brief encounter. At some point, a narcotics detection dog was called in, however, Deputy Mitchell testified that the handler and dog would have arrived in 20 minutes or less. [83], p. 72. Such a detention for the purpose of exposing luggage to a narcotics detection dog has been upheld as reasonable and not to exceed the bounds of Terry. United States v. Hooper, 935 F.2d 484, 498 (2d Cir. 1991). *See also* United States v. $60,020.00 U.S. Currency, 41 F. Supp. 3d 277 (W.D.N.Y. 2011) (a 90-minute detention of an airline passenger and the $60,020 in currency found in his possession awaiting the arrival of a drug-detection dog, was reasonable under Terry); Grice v. McVeigh, 873 F.3d 162, 168 (2d Cir. 2017) (citing affirmatively to authority holding that a Terry stop lasting 62 minutes was not a *de facto* arrest).

The record also fails to demonstrate that the defendant was completely at the mercy of the police. He was not handcuffed or even frisked and was repeatedly told that he was not under arrest. [83], pp. 61, 65. There were only two deputies principally involved in the discussion with defendant and defendant does not contend that weapons were displayed or that he was surrounded by officers or otherwise threatened. *See* Newton, 369 F.3d at 675 (presence of six officers "would not, by itself, have led a reasonable person . . . to conclude that he was in custody").

I find that defendant voluntarily accompanied the deputies to the office to continue the discussion started in the terminal, and that at no point did the encounter cease to be

consensual. However, even if it were determined that the consensual encounter had transformed into a Terry stop, the suppression of the evidence and statements obtained during the encounter would still not be warranted.

C.  **Search of the Cell Phones**

Defendant also argues that the search of his three cell phones was illegal. Deputy Mitchell testified that when asked by Deputy Santana, defendant consented to the search of the phones, stating "something to the effect yeah, go ahead" and that he did not object to the search of the phones. [83], p. 83. Defendant's declaration does not refute that he provided verbal consent to allow the search of his phones, but states only that he does "not recall being presented [with] a consent form for [his] cell phones". [50-2], p. 3.

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); see also United States v. Simmons, 543 F. App'x 101 (2d Cir. 2013). "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." United States v. Garcia, 56 F.3d 418, 422, 423 (2d Cir. 1995). "[T]he issue of reasonableness is to be measured by an objective standard." Id.

Here, although he did not recall the exact words used, Deputy Mitchell testified that in his presence Deputy Santana asked defendant for permission to search the phones, and that defendant consented by responding with words to the effect: "yeah, go ahead". [83], p. 83. Deputy Mitchell added that upon being asked for consent to search the phones, defendant did not say "no" or "don't search my phone". Id.  I find Deputy Mitchell's testimony to be credible. Based upon the totality of the record in this case, the deputies had a reasonable basis to believe

- 12 -

that defendant consented to the search of the phones. His motion to suppress the evidence obtained from that search should be denied.

## CONCLUSION

For these reasons, I recommend that defendants' motion to suppress [50] be denied. Unless otherwise ordered by Judge Wolford, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by September 21, 2018. Any requests for extension of this deadline must be made to Judge Wolford. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: September 7, 2018

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge