UNITED STATES OF AMERICA,

                               **DECISION AND ORDER**

      v.

                               1:17-CR-00129 EAW

RICHARD LUCAS,

           Defendant.
_____

## INTRODUCTION

Defendant Richard Lucas ("Defendant") stands accused by way of a one-count Indictment returned on July 11, 2017, with conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846. (Dkt. 18). A jury trial is scheduled to commence on May 14, 2019. (Dkt. 189).

A suppression hearing was held in this matter on May 7, 2018, and continued on July 13, 2018. (Dkt. 68; Dkt. 94). The Court ultimately denied Defendant's motion to suppress in its entirety. (Dkt. 127; Dkt. 144).

Currently pending before the Court is Defendant's motion for reconsideration of portions of the Court's denial of his motion to suppress. (Dkt. 188). In particular, Defendant asks the Court to find: (1) on May 15, 2017, he was provoked into fleeing by the actions of law enforcement, and therefore no probable cause existed for his arrest that same day; and (2) on January 26, 2017, law enforcement unlawfully detained Defendant, and all evidence

resulting from that stop should be suppressed. For the reasons set forth below, Defendant's motion is denied.

## BACKGROUND

The background of this matter is set forth in detail in the Court's Decision and Order entered October 5, 2018 (Dkt. 127) (the "October 5th Decision and Order"), familiarity with which is assumed for purposes of this Decision and Order. The Court will summarize the relevant factual and procedural background as necessary.

### I.    Traffic Stop on May 15, 2017

As the Court set forth in the October 5th Decision and Order, the credible evidence adduced at the suppression hearing in this matter established that on May 15, 2017, Defendant rented Room #113 at the Comfort Inn and Suites Buffalo Airport Hotel located at 901 Dick Road, Cheektowaga, New York 14225 (hereinafter referred to as "the Comfort Suites"). (Dkt. 127 at 5). On that day, Erie County Sheriff's Deputies Day and Milbrandt were performing surveillance of Mr. Daniels at the Comfort Suites. (*Id.*). Deputy Day was not wearing a police uniform and was in an unmarked vehicle. (*Id.*).

Deputy Day observed Defendant and his 14-year-old son arrive at the Comfort Suites' parking lot in a black 2017 Corvette bearing a Texas license plate. (*Id.* at 6). The Corvette had its hard-top roof removed and had windows that were so darkly tinted the deputies could not see inside, in violation of New York Vehicle and Traffic Law § 375(12-a)(b)(2). (*Id.* at 6-7).

Defendant drove the Corvette to the rear of the Comfort Suites and parked, then he and his son exited the vehicle. (*Id.* at 7). Deputies Day and Milbrandt followed the Corvette in their vehicle and, when Defendant and his son observed Deputies Day and Milbrandt they immediately returned to their vehicle. (*Id.*).

Deputy Milbrandt pulled his vehicle behind the Corvette so that it could not back up. (*Id.* at 8). The deputies exited their vehicle and approached the Corvette, with Deputy Day at the passenger's side and Deputy Milbrandt at the driver's side. (*Id.*). Deputy Day testified, and the Court found credible, that he and Deputy Milbrandt identified themselves as law enforcement and Deputy Day displayed his badge/shield. (*Id.*). Defendant stated in a declaration that the deputies did not identify themselves, but the Court did not credit that assertion. (*Id.* at 8-9).

After approaching the vehicle, Deputy Milbrandt inaccurately stated that he and Deputy Day were investigating activity related to cars in the parking lot. (*Id.* at 9). Deputy Milbrandt asked Defendant for identification and Defendant acted nervous and expressed anger at having been stopped, at which point Deputy Day informed Defendant that he was driving with tinted windows in violation of New York law. (*Id.*).

Defendant stated that his name was "Rich" and he began to open the door, prompting Deputy Milbrandt to instruct him to stay in the vehicle. (*Id.*). Defendant ignored this instruction and continued to exit the vehicle, at which point Deputy Day relocated to the driver's side. (*Id.*). Once Defendant emerged from the Corvette, the deputies instructed him

to put his hands on the vehicle. (*Id.* at 10). Defendant initially complied, but then began taking his hands off the vehicle and trying to turn towards the deputies. (*Id.*). Defendant also refused to provide identification or his full name. (*Id.*). The deputies told Defendant to relax and place his hands on the vehicle so he could be frisked for weapons. (*Id.*).

Deputy Day placed his hand on Defendant's thigh, and Defendant turned again. (*Id.*). Deputy Day then physically placed Defendant's hands on the rear fender of the Corvette and told him that he would be placed in handcuffs if he continued to move. (*Id.*). Defendant turned again and Deputy Day told him he was going to be handcuffed. (*Id.*). The deputies attempted to handcuff Defendant, but he ran towards them and caused everyone to fall onto the ground. (*Id.*). The deputies tried to place Defendant in handcuffs while he was on the ground, but Defendant's son exited the vehicle and attacked Deputy Milbrandt, which allowed Defendant to get up from the ground and start running. (*Id.* at 10-11).

Defendant claimed in his declaration that he had panicked when one of the deputies touched him, which cause him to break free and run away. (*Id.* at 11).

Deputy Day chased Defendant, and, on three occasions, Defendant attempted to enter an occupied vehicle. (*Id.* at 11). Three Drug Enforcement Agency ("DEA") special agents who were also involved in the investigation into Defendant's alleged narcotics trafficking were traveling in a vehicle and observed Defendant running from Deputy Day. (*Id.*). The DEA agents exited their vehicle and assisted in the apprehension of Defendant. (*Id.* at 11-12). Defendant was tackled, handcuffed, and taken into custody. (*Id.* at 12).

In his motion to suppress, Defendant argued that he had been unlawfully seized on May 15, 2017, and advanced several arguments in support of that contention. (*See id.* at 17-19). The Court considered each of these arguments and concluded: (1) Deputies Day and Milbrandt were justified in their initial stop of Defendant because they had an objectively reasonable belief that he was operating a vehicle with side windows that were unlawfully tinted in violation of New York Vehicle and Traffic Law; (2) based on the lawfulness of the traffic stop and Defendant's suspicious behavior, the deputies were justified in asking Defendant to place his hands on the vehicle so he could be frisked; (3) law enforcement was justified in arresting Defendant post-flight based on the totality of the circumstances; and (4) the statements Defendant made after he was taken into custody were knowing and voluntary. (*Id.* at 23-33).

## II. Encounter at Buffalo Niagara International Airport on January 26, 2017

At the suppression hearing, DEA special agent Christopher Wisniewski, who had been involved in an investigation of Defendant since late 2016, testified that on January 26, 2017, the investigative team received information that Defendant would be traveling from the Buffalo Niagara International Airport to Houston with a large sum of money to purchase cocaine. (T[1] at 184). Agent Wisniewski further testified that members of the investigative

---

[1] The transcript of the suppression hearing conducted on May 7, 2018, was filed at docket number 83 (pages 1 through 144), and the transcript of the suppression hearing conducted on July 13, 2018, was filed at docket number 94 (pages 145 through 286). As noted, the transcripts are consecutively paginated. The Court will simply refer to "T" and the

team followed Defendant from his home to the airport, and that after Defendant cleared security, Agent Wisniewski spoke to an airline representative and found that Defendant was not listed as a passenger. (*Id.*).

Law enforcement located Defendant in the gate area of the airport, and Special Agent T.J. Webb from the Department of Homeland Security and Detective John Palitowski from the Niagara Frontier Transportation Authority approached him. (*Id.*). Agent Wisniewski was in the area and was able to observe the interaction, but did not approach. (*Id.* at 184, 269). Defendant produced identification in the name of Johnny McDuffy, who he said was his cousin. (*Id.* at 185). Agent Wisniewski testified that Defendant was then asked if he would be willing to accompany the officers to a security screening office to answer some questions about the identification he had produced and that Defendant voluntarily went. (*Id.* at 269). On cross-examination, Agent Wisniewski stated that he did not believe anyone had expressly told Defendant he had the right not to go to the security screening office. (*Id.* at 269-70). Defendant accompanied law enforcement to the security screening office where he was questioned. (*Id.* at 185).

In his motion to suppress, Defendant did not seek suppression of the statements he made to law enforcement on January 26, 2017. (Dkt. 127 at 48-49). However, in his post-hearing memorandum, Defendant raised an argument related to this encounter. (*See id.*; Dkt.

---

corresponding transcript page (not CM/ECF page) when citing the suppression hearing transcript.

113 at 20-22). The Court declined to reach this issue, noting that it was not appropriate to raise a claim for the first time in a post-hearing memorandum of law. (Dkt. 127 at 48-49). The Court further stated that if and when Defendant properly filed a motion addressed to this evidence, the Court would address its timeliness. (*Id.* at 49).

### III. Defendant's Motion for Reconsideration

Defendant filed the instant motion for reconsideration on May 1, 2019. (Dkt. 188). The Government filed its response on May 6, 2019. (Dkt. 195). The Court held oral argument on May 9, 2019, at which time it reserved decision. (Dkt. 206).

## DISCUSSION

### I. Legal Standard

Although the Federal Rules of Criminal Procedure do not specifically recognize motions for reconsideration, such motions "have traditionally been allowed within the Second Circuit." *United States v. Yannotti*, 457 F. Supp. 2d 385, 388 (S.D.N.Y. 2006). District courts "have applied the applicable civil standard to such motions in criminal cases." *United States v. Larson*, No. 07-CR-304S, 2013 WL 6196292, at *2 (W.D.N.Y. Nov. 27, 2013).

> The standard for granting . . . a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Common grounds for reconsideration include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl.*

*Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation omitted). "These criteria are strictly construed against the moving party so as to avoid repetitive arguments on issues that have been considered fully by the court." *Boyde v. Osborne*, No. 10-CV-6651, 2013 WL 6662862, at *1 (W.D.N.Y. Dec. 16, 2013) (quoting *Griffin Indus., Inc. v. Petrojam, Ltd.*, 72 F. Supp. 2d 365, 368 (S.D.N.Y. 1999)).

"[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader*, 70 F.3d at 257; *see also Davidson v. Scully*, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001) ("A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court."). The decision to grant or deny a motion for reconsideration is within "the sound discretion of the district court[.]" *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (citation omitted). Above all, "[r]econsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (quoting *In re Health Mgmt. Sys. Inc. Secs. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).

## II. Reconsideration Is Not Warranted

Defendant has failed to demonstrate that reconsideration is warranted in this case. The Court has considered each of the arguments made by Defendant and rejects them for the reasons set forth below.

### A. Evidence Obtained from the Traffic Stop on May 15, 2017

The Court turns first to Defendant's arguments regarding the traffic stop on May 15, 2017, and the actions that followed thereafter. Defendant urges the Court to reconsider its denial of his motion to suppress all evidence obtained from this traffic stop and his subsequent arrest and questioning, contending that he was unlawfully provoked into flight by Deputies Day and Milbrandt.

"[A] motion for reconsideration is neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced[.]" *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005). Defendant did not raise his arguments regarding provoked flight in his motion to suppress, nor has he proffered any excuse for his failure to do so.

Moreover, Defendant's provoked flight argument is inconsistent with the factual determinations previously made by this Court. Federal courts have found that "officers cannot improperly provoke—for example, by fraud—a person into fleeing and use the flight to justify a stop." *United States v. Franklin*, 323 F.3d 1298, 1302 (11th Cir. 2003); *see also United States v. Jeter*, 721 F.3d 746, 754 (6th Cir. 2013) ("Despite the lack of clarity on the matter

of provoked flight, we can certainly extrapolate some guiding principles. Fraud, for example, would surely suggest wrongdoing on the part of the officers and thus make a finding of provocation more likely. If police officers put a defendant in reasonable fear of physical harm, that might also qualify as provocation."). In assessing whether flight was provoked, the Court considers "whether a reasonable and innocent person facing [the] situation would have been caused to flee in the same manner as" the defendant. *Franklin*, 323 F.3d at 1302.

In this case, the Court found based on the evidence produced at the suppression hearing and its assessment of the witnesses' credibility, that Deputies Day and Milbrandt identified themselves as law enforcement officers, that Deputy Day showed Defendant and his son his badge, that Defendant refused to produce identification, that Deputy Day told Defendant that he had been stopped because of the excessive tint on this windows, that the deputies instructed Defendant to stay in the vehicle but that he nonetheless exited it, that the deputies gave Defendant multiple opportunities to comply with their instructions before attempting to handcuff him, and that Defendant then fled. Defendant has not presented any cognizable reason for the Court to revisit its factual determinations, save his apparent disagreement therewith. (*See, e.g.*, Dkt. 188 at ¶ 24 ("Mr. Lucas has claimed that he did not know that the people were police officers.")). The Court therefore declines to reconsider the factual determinations set forth in the October 5th Decision and Order.

On the facts as assessed by the Court, "there is no evidence suggesting that the . . . officers intended for or expected [Defendant] to flee." *Jeter*, 721 F.3d at 754. No reasonable

and innocent person in Defendant's situation (that is, an individual approached by officers who identified themselves as law enforcement, showed a badge, and asked the individual to stay in his vehicle) would have been provoked into flight. Deputies Day and Milbrandt did not improperly threaten Defendant with force, nor is the initial statement to Defendant that they were investigating car larcenies a "fraud" such that a reasonable person would determine flight to be an appropriate response.

The Court also briefly considers an argument not contained in Defendant's papers but advanced by defense counsel at oral argument. Shortly before the oral argument in this matter on May 9, 2019, defense counsel e-mailed the Court and counsel for the Government a copy of *United States v. Gomez*, 877 F.3d 76 (2d Cir. 2017). Defense counsel contended at oral argument that suppression of the evidence obtained from the traffic stop on May 15, 2017, is also required under *Gomez* because Deputies Day and Milbrandt failed to question Defendant about the tint on his windows, which was the justification for the stop. This argument is wholly unfounded.

The Supreme Court has found that the Fourth Amendment will tolerate unrelated investigations during a traffic stop so long as the roadside detention is not lengthened as a result. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). Thus, the Second Circuit found in *Gomez*, "the 'critical question' is not whether the unrelated investigation 'occurs before or after the officer issues a ticket,' but whether conducting the unrelated investigation

'prolongs—*i.e.*, adds time to—the stop.'" 877 F.3d at 89 (quoting *Rodriguez*, 135 S. Ct. at 1616).

There is no basis to conclude that Deputies Day and Milbrandt somehow impermissibly extended the traffic stop on May 15, 2017. To the contrary, Deputies Day and Milbrandt were unable to perform any investigation whatsoever during the traffic stop on May 15, 2017, because Defendant was immediately uncooperative, refused to provide identification and stay in his vehicle as instructed, and ultimately fled the scene. There is no evidence that the deputies questioned Defendant about the alleged car larcenies or matters unrelated to his unlawfully tinted windows, or that they in any other way prolonged the stop. Instead, it was Defendant who transformed the matter from a routine traffic stop. Moreover, there is no reason that Defendant could not have raised his *Gomez*-based argument in his initial motion for suppression. Reconsideration of the Court's prior decision is not warranted on this basis.

### B. Evidence Obtained from the Airport Encounter on January 26, 2017

The Court turns next to Defendant's argument as to his encounter with law enforcement at the Buffalo Niagara International Airport on January 26, 2017. As a threshold matter, the Court considers the timeliness of Defendant's request.

As the Court previously set forth, Defendant did not seek suppression of this evidence in his motion to suppress. Federal Rule of Criminal Procedure 12(c)(1) permits the Court to set a deadline for making pretrial motions. In this case, the Court set a deadline of February

23, 2018, for Defendant to file pretrial motions. (Dkt. 45). Nonetheless, Defendant did not seek suppression of the evidence obtained from the airport encounter on January 26, 2017, until he filed his post-hearing memorandum on September 4, 2018. (Dkt. 113).

"If a party does not meet the deadline for making a . . . motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3). "Just as a failure to file a timely motion to suppress evidence constitutes a waiver, so too does a failure to raise a particular ground in support of a motion to suppress." *United States v. Godbey*, No. 11-CR-00292-RJA-JJM, 2012 WL 4061215, at *4 (W.D.N.Y. Aug. 27, 2012), *report and recommendation adopted*, No. 11-CR-292A, 2012 WL 4061085 (W.D.N.Y. Sept. 14, 2012).[2]

Defendant has not shown good cause for his failure to timely seek suppression of the evidence obtained from the January 26, 2017, airport encounter. While defense counsel suggested that they might not have been aware of the encounter at the time the motion to suppress was filed (*see* Dkt. 188 at 11), the Government has submitted evidence that current defense counsel were advised of the Government's intent to use the evidence obtained from the encounter by no later than August 4, 2017. (Dkt. 195 at 7). Because Defendant has not

---

[2] The 2014 amendments to the Federal Rules of Criminal Procedure "removed the word 'waiver' from the Rule. . . . However, while Rule 12(c)(3) deleted the reference to 'waiver,' the amendment did not alter the applicable standard." *United States v. Archambault*, No. 13-CR-100A, 2016 WL 3546022, at *3 (W.D.N.Y. May 10, 2016) (alteration and quotation omitted).

shown good cause, the Court finds that it need not consider his untimely request for suppression of this evidence.

However, even if good cause did exist for the untimely filing, Defendant's motion fails on the merits. "Law enforcement officers do not violate the Fourth Amendment by . . . approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen[.]" *Florida v. Royer*, 460 U.S. 491, 497 (1983). Moreover, "a law enforcement agent's request to step inside a police office [does not] without more transform[] an otherwise consensual encounter into a fourth amendment seizure." *United States v. Torres*, 949 F.2d 606, 608 (2d Cir. 1991).

Agent Wisniewski testified without contradiction in this case that Defendant was asked if he would accompany law enforcement to a security screening office to answer questions and that he voluntarily agreed to do so. Nothing in Agent Wisniewski's testimony suggested that Defendant was coerced or intimidated into accompanying law enforcement, nor has Defendant submitted any evidence to support such a finding. Indeed, Defendant's declaration submitted in support of his motion to suppress did not address the airport encounter. (*See* Dkt. 35-3).

Defendant appears to suggest that he was unlawfully seized because law enforcement did not expressly tell him that he was free to terminate the interview and leave. However, "[t]here is no requirement that an officer affirmatively advise an interviewee that he is free to

leave or terminate the interview." *United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir. 1991).

Defendant cites *United States v. Glover*, 957 F.2d 1004 (2d Cir. 1992) in support of his contention. However, in *Glover*, not only did law enforcement ask the defendant to accompany them to a police room and not tell him he was free to leave, law enforcement also took and retained the defendant's identification. *Id.* at 1009. In this case, there is no evidence that law enforcement confiscated Defendant's identification or otherwise conveyed to him that he was not free to go. This case is therefore distinguishable from *Glover*.

In sum, the Court finds that there is no basis in this case to disbelieve Agent Wisniewski's testimony that Defendant voluntarily agreed to accompany law enforcement to the security screening office and answer questions. Nor is there any basis to conclude that the officers "convey[ed] a message that compliance with their requests [was] required." *Glover*, 957 F.2d at 1008 (quotation omitted). As such, the Court finds that suppression of the information obtained from Defendant's encounter with law enforcement at the Buffalo airport on January 26, 2017, is not warranted.

## CONCLUSION

For the foregoing reasons, Defendant's motion for reconsideration (Dkt. 188) is denied in its entirety.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: May 13, 2019
Rochester, New York